# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO, WESTERN DIVISION

| | | |
|---|---|---|
| Dinesh Patel, et al., | ) | Case No. |
| Plaintiffs, | ) | Judge: |
| vs. | ) | **MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INUNCTION AND SUPPORTING MEMORANDUM** |
| Andrew Glenn, et al., | ) | |
| Defendants | ) | |
| | ) | |
| | ) | Bertrand R. Puligandla (OH61140) |
| | ) | 1700 Canton, Ste. 1-A |
| | | Toledo, Ohio 43604 |
| | ) | Telephone: (419) 283-0698 |
| | | Facsimile: (419) 321-1991 |
| | ) | Email: brpesq@hotmail.com |
| | ) | |
| | ) | Counsel for the Plaintiffs |

## MOTION

Now come the Plaintiffs, Dinesh Patel and Minaxi Patel, by and through counsel, and under F.R.C.P. 65(b), move the Court to issue a temporary restraining order and/or a preliminary injunction against all Defendants commanding them to: (1) remove all signs declaring the building unsafe for human occupancy and yellow tape posted on the doors of the Budget Inn motel, 156 Dussel Dr., Maumee Ohio; (2) allow the Plaintiffs to immediately reopen the Budget Inn motel for business; and (3) allow the Plaintiffs to move back into and reside in their home, which is an apartment located inside the Budget Inn motel. The reasons for this motion are set forth in the attached memorandum. A proposed temporary restraining order is attached as Exhibit A, and a proposed preliminary injunction is attached as Exhibit B.

1

Respectfully submitted,

/s/Bertrand R. Puligandla
Bertrand R. Puligandla(OH61140)
1700 Canton, Ste. 1-A
Toledo, Ohio 43604
Telephone: (419) 283-0698
Facsimile: (419) 321-1991
Email: rpesq@hotmail.com

## MEMORANDUM

### I. Factual Background and Allegations

1. At all relevant times, Plaintiff Dinesh Patel was the principal and/or agent of Lovesai, L.L.C., whose trade name is the Budget Inn Maumee (hereinafter, "Budget Inn), located at 156 Dussel Drive, Maumee, Ohio 43537.

2. The Budget Inn motel is comprised of two two-story buildings. A true and accurate photograph of the motel is attached as Exhibit A.

3. On or about September 10, 2020, Plaintiff Dinesh Patel was painting outside the Budget Inn when he saw Defendant Andrew Glenn and Defendant Zachary Jenkins taking photographs of the building. Patel asked them if there was anything he should be concerned about and they replied in the negative and left after a while.

4. On or about October 20, 2020, at about 11:00 a.m., Defendant Glenn, Defendant Jenkins, and Defendant John Doe 1 came to the Budget Inn and handed Plaintiff Dinesh Patel the following documents: (1) a Notice of Public Nuisance, (2) a Notice of Code Violations, (3) a copy of Maumee Municipal Code (hereinafter, "M.M.C.") Ch. 1345, entitled, "Nuisances," (4) a copy of M.M.C. Ch. 1135, entitled, "Site Plan," (5) a copy of M.M.C. Ch. 1145, entitled, "Minimum Landscape Requirements," (6) a copy of M.M.C. Ch. 1136, entitled, "Design Standards," and (7) copies of twelve photographs of the building and grounds.

2

5. After handing Plaintiff Dinesh Patel the documents, Defendant Glenn and Defendant Jenkins told him they were shutting down the motel because it was unsafe. Defendant Glenn, Defendant Jenkins and Defendant John Doe 1 then went to every rented room in the motel and told the customers in them they had to immediately vacate their rooms and leave the premises. Defendants Glenn and Jenkins also told Plaintiff Dinesh Patel that he had to immediately vacate his first-floor apartment located in the front building of the motel, in which he lived with his wife. Patel convinced them to give him until 7:00 p.m. to vacate.

6. Around 7:00 p.m., Defendant Glenn, Defendant Jenkins, and Defendant John Doe 1 returned, along with Defendant John Doe 2, to confirm that all customers had vacated the building; the Plaintiffs were there when they returned. After so confirming, and escorting the Plaintiffs out of the building, Defendant Glenn and/or Defendant Jenkins and/or Defendants John Does 1 and 2, put yellow tape on all doors, along with signs dated October 21, 2020, that read in pertinent part: "DANGER This Structure Is declared Unsafe For Human Occupancy or Use. It is Unlawful For Any Person To Use or Occupy This Building After October 21, 2020" under "Code 1345.01(a)."

7. Defendant Glenn and/or Defendant Jenkins then told the Plaintiffs that if they wanted to retrieve anything else from their apartment, they could come back to do so but would have to call and inform them beforehand or they would be arrested.

8. The Plaintiffs Dinesh and Minaxi Patel vacated their apartment with only hastily-packed suitcases, leaving most of their possessions behind, and went to stay at a friend's motel. The Plaintiffs stayed at their friend's motel for about two weeks before going to Albuquerque, New Mexico, to stay with one of their adult children. Apart from their motel apartment, the Plaintiffs have no other residence.

9. The Notice of Public Nuisance was issued under Maumee Code §1345.01(a), alleging in pertinent part that:

3

[a]n inspection of your property revealed several areas of spalling concrete on the underside of the second story balcony and several support piers for this balcony are crumbling and/or have been improperly repaired. This dilapidation and deterioration of the concrete and brick pose a danger to anyone using the premises by reason of falling bricks or broken pieces of concrete, therefore, it has been determined by the Zoning Administrator and the Chief Building Official that the property located at 156 Dussel Dr. is a Public Nuisance as defined in Section 1345.01(a) of the Maumee Building Code...

10. The Notice of Public Nuisance then demanded that: (1) "Under the Order of Summary Abatement," the premises be "immediately vacated" upon service of the Notice, and (2) Plaintiff Dinesh Patel abate the nuisance conditions within 72 hours after service of the Notice, and should he not do so, the City of Maumee would abate the nuisance, at his expense, without further notice. The Notice then referred the Plaintiffs to the copy of Ch. 1345 to read about their right to appeal, the procedure for same, and the penalty for failing to obey the order of summary abatement; the Notice did not spell those items out or provide any instructions.

11. The Notice of Code Violations set forth five alleged zoning and property maintenance violations and ordered Plaintiff Dinesh Patel to submit a full site plan for review and approval to Defendant Glenn by November 20, 2020, detailing actions to be taken to correct them. It also demanded the payment of a $500.00 application fee.

12. Plaintiff Dinesh Patel did not submit a site plan or appeal. But on or about October 23, 2020, he telephoned Dwight Gilliland (hereinafter, "Gilliland"), an architect/engineer, who stopped at the motel the next day. Gilliland told Plaintiff Dinesh Patel that he could only address the landscaping issues listed in the "Notice of Code Violations," and recommended that Patel hire Larry Fast to address the other issues.

13. On or about November 20, 2020, Gilliland submitted two drawings to Defendant Glenn and/or Defendant Jenkins, which contained his proposed solutions to the landscaping issues.

4

14. On or about October 27, 2020, Plaintiff Dinesh Patel hired Larry L. Fast, P.E., (hereinafter, "Fast"), a forensic engineer, to evaluate the Budget Inn for the other issues alleged in the Notice of Public Nuisance and/or the Notice of Code Violations. On or about October 29, 2020, Fast visited the motel premises, and accompanied by Plaintiff Dinesh Patel, made the evaluation.

15. On November 3, 2020, Fast submitted a letter to Defendant Jenkins, in which he stated the following among his findings: (1) even though they needed repairs, the second-floor walkways adequately supported pedestrian loads; (2) there was no reason to prohibit the rental of the first-floor motel units while the second-floor walkways and brick column tops were being repaired; and (3) there were no structural reasons to prohibit Plaintiff Dinesh Patel from residing in his apartment immediately and during repairs.

16. On or about November 12, 2020, Fast again visited the Budget Inn to perform an evaluation of the second-floor walkways surrounding all four sides of the second-floor rooms. On November 14, 2020, he submitted a letter to Defendant Jenkins, in which he stated the following among his findings: (1) the spalling and displaced bricks at the top of the brick columns and north wall could be easily repaired; and (2) the walkways were structurally safe and both the first and second-floor motel rooms and attached residence could be safely occupied.

17. Each time Plaintiff Dinesh Patel met Fast and Gilliland at the motel, he notified Defendant Jenkins in advance by telephone. And each time Fast or Gilliland visited the motel, they would confer with Patel in his apartment. No City of Maumee personnel supervised these visitations to the motel premises.

18. Neither Defendant Jenkins nor Defendant Glenn responded in writing to either of Fast's letters, or to either of Gilliland's drawings. In addition, even though Defendant Jenkins had spoken several times to Fast by telephone, he never expressed disagreement with Fast's conclusions about

5

what work needed to be done to the building or whether it posed a danger or was structurally unsound. Neither did Defendant Glenn.

19. On or about November 18, 2020, Defendant Jenkins telephoned Plaintiff Dinesh Patel (who by now, along with his wife, was staying with one of their adult children in Albuquerque, New Mexico) and stated that he and Defendant Glenn wanted to meet with him in person on November 21, 2020, to discuss the situation. Plaintiff Dinesh Patel took a flight back on November 21, 2020 to attend the meeting, but after he arrived, Defendant Glenn telephoned him and said the meeting was canceled. They agreed to reschedule the meeting for December 1, 2020.

20. Instead of flying back to New Mexico, Plaintiff Dinesh Patel stayed at his friend's motel, anticipating the meeting. But shortly before that meeting, Defendant Jenkins telephoned Patel and canceled again.

21. Finally, on December 7, 2020, Plaintiff Dinesh Patel, along with his friend, Rakesh Mistry, met in person in Maumee, Ohio, with Defendant Jenkins and a man named Pat (last name unknown); Defendant Glenn, along with another unknown person, attended via Zoom. Per Defendant Glenn's instruction, Defendant Jenkins told Fast not to come to the meeting. Weeks before the meeting, Fast had told Defendant Jenkins that he wanted to get started doing the repairs identified in his letters, but Defendant Jenkins, per Defendant Glenn's instruction, told Fast not to start on them until after the meeting.

22. At the meeting, neither Defendant Glenn nor Defendant Jenkins said anything about the matters allegedly posing a danger to the public; instead, they spoke only about the other items (1), (4), and (5) in the Notice of Code Violations. And there was no discussion of Fast's evaluations. But Defendant Glenn indicated that Gilliland's drawings were not "legal," and were thus unacceptable. Patel defended Gilliland's work; he then asked Defendant Jenkins to telephone Gilliland to discuss what else was needed. But then Defendant Glenn interjected, saying that Jenkins "was not your

6

servant," and instructed Jenkins not to call Gilliland. Defendant Glenn also falsely accused Patel of having installed eight or nine sinks in his motel rooms without obtaining a permit, and that he thus owed the City of Maumee three to four thousand dollars; when Patel denied the accusation, Defendant Glenn told him "you can't argue with us." Finally, when Patel asked if he could at least move back into his apartment, Defendant Glenn answered in the negative. The meeting lasted between twenty and thirty minutes.

23. M.M.C. §1345.03 does not authorize the City of Maumee and/or its employees to close a business or remove persons from their home.

24. M.M.C. §1345.08, entitled, "Emergency abatement," purports to authorize the City of Maumee and/or its employees to take immediate action to abate a nuisance that constitutes an emergency without prior notice as the term "emergency" is defined in M.C. §1345.08(b), but the Defendants did not act under authority of that statute. And that statute does not authorize the City of Maumee and/or its employees to close a business or remove persons from their home.

25. The Defendants never sought or obtained a court order authorizing either the closure of the Budget Inn motel or the removal of the Plaintiffs Dinesh and Minaxi Patel from their home therein.

26. The Plaintiffs Dinesh and Minaxi Patel deny that: (1) any danger to the public ever existed or currently exists at the Budget Inn and (2) any emergency or exigency authorized any Defendant to close their business and remove them from their home.

27. On or about January 18, 2021, Fast forwarded an email he received from Defendant Jenkins to Plaintiff Dinesh Patel indicating that the plans he had submitted were approved, but that to obtain a building permit, Defendant Glenn would still have to approve a site plan and issue a zoning permit. To be clear, Fast submitted only plans, not drawings.

7

28. As of the date of filing of this complaint, the Budget Inn remains closed, the signs declaring it unsafe and yellow tape remain on the building, and the Plaintiffs have not been allowed to move back into their residence. And the alleged nuisance has not been abated.

29. The Defendants removed the Plaintiffs from their home and closed their business under the false claim that the Budget Inn posed a danger to the public as a pretext to force the Plaintiffs to make repairs to the building and grounds.

## II. Argument

### Standard for granting motion

A temporary restraining order (TRO) can be issued without notice to the adverse party. The purpose of a TRO is to preserve the status quo until a court can make a reasoned resolution of a dispute. FRCP 65(b)(1); Malam v. Adducci, 459 F. Supp. 3d 867, 874; 2020 U.S. Dist. Lexis 83135; 2020 WL 2468481 (citing Procter & Gamble Co. v. Bankers Trust Co., 78 F.3d 219, 226 (6th Cir. 1996). Where a defendant is on notice of the filing of the motion, a court may treat the motion for a TRO as one for a preliminary injunction. Id. (citing Perez-Perez v. Adducci, 459 F. Supp. 3d 918, 924; 2020 U.S. Dist. Lexis 81912). The same factors apply to both a motion for a TRO and a motion for a preliminary injunction. Perez-Perez at 924 (citing Ohio Republican Party v. Brunner, 543 F. 3d 357, 362 (6th Cir. 2008).

The petitioner bears the burden of showing entitlement to injunctive relief. Perez-Perez at 924. In determining whether to grant a preliminary injunction, the Court must weigh four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuing the injunction would cause substantial harm to others; and (4) whether the public interest would be served by granting the injunction. Id. The four factors are not prerequisites, but instead are interrelated considerations to be

8

balanced. Id. When the government is the party opposing the issuance of a temporary restraining order, the third and fourth factors are merged. Id.

**(1) The Plaintiffs have a strong likelihood of success on the merits of at least three of their claims.**

For a claim under 42 U.S.C. §1983, a plaintiff must prove that: (1) the defendant, while acting under color of state law, (2) deprived him of a right secured by the Constitution or laws of the United States. Gomez v. Toledo, 446 U.S. 635, 640, 64 L. Ed. 2d 572, 100 S. Ct. 1920 (1980); Thomas v. Cohen, 304 F.3d 563, 568; 2002 U.S. App. Lexis 17528; 2002 Fed. App. 0287P (6th Cir.). A government official's discretionary abuse of power that goes beyond the scope of his authority will usually have been performed under color of state law for purposes of liability under the statute. Cassady v. Tackett, 938 F.2d 693, 700 (6th Cir. 1991); Thomas at 568.

For a preliminary injunction, "[t]he probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury the movants will suffer without the stay." Malam, *supra*, at 888 (quoting Northeast Ohio Coal. for Homeless and Serv. Emps. Intern. Union, Local 1199 v. Blackwell, 467 F. 3d 999, 1009 (6th Cir. 2006). Nonetheless, the Plaintiffs submit they have a strong likelihood of success on the merits of at least three of their claims.

### *Procedural Due Process Claim*

The Fourteenth Amendment provides that "no state shall deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. Assessment of procedural due process claims involves two steps: (1) whether the plaintiff has a protected liberty or property right entitled to due process protection, and (2) whether the deprivation of that interest contravened notions of due process. Thomas at 576. The Constitution does not create property rights; instead, those rights are created and defined from other sources such as state law. Thomas at 576. Possessory interests in property invoke procedural due process protections. Thomas at 575. Before real property is seized, the owner is entitled to notice and an opportunity to be heard. United States v.

9

James Daniel Good Real Prop., 510 U.S. 43, 126 L. Ed. 2d 490, 114 S. Ct. 492 (1993). "The government may not take property like a thief in the night; rather, it must announce its intentions and give the property owner a chance to argue against the taking. This simple rule holds regardless of whether the property in question is…a Cadillac or a cart." Phillips v. City of Cincinnati, 2020 U.S. Dist. Lexis 145507, *66; 2020 WL 4698800 (quoting Clement v. City of Glendale, 518 F. 3d 1090, 1093 (9th Cir. 2008). Therefore, generally, people whose property interests are at stake are entitled to notice and an opportunity to be heard. Id at *66; see also, Thomas, *supra*, at 576. In other words, a fundamental requirement of due process is the opportunity to be heard, which must be granted at a meaningful time and in a meaningful manner. United Pet Supply, Inc., v. City of Chattanooga, 768 F.3d 464, 485 (6th Cir. 2014). The "root requirement" of the Due Process Clause is that a person be given the opportunity for a hearing before being deprived of a significant property interest. Silberstein v. City of Dayton, 440 F.3d 306, 315 (6th Cir. 2006)(quoting Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542, 105 S. Ct. 1487, 84 L. Ed. 2d 494(1985).

Notwithstanding the foregoing, however, when a situation requires quick action by the government or makes the provision of a meaningful pre-deprivation process impracticable, the government or its agents can proceed without violating the property owner's rights so long as an adequate post-deprivation procedure is provided. Harris v. City of Akron, 20 F. 3d 1396, 1401 (6th Cir. 1994). Therefore, a procedural due process claim will be dismissed where: the government provides an adequate post-deprivation remedy and: (1) the deprivation was unpredictable or random; (2) pre-deprivation process was impracticable or impossible; and (3) the state actor was not authorized to take the action that deprived the plaintiff of liberty or property. Copeland v. Machulis, 57 F. 3d 476, 479 (6th Cir. 1995). But the requirement that a §1983 plaintiff show the inadequacy of the state's post-deprivation corrective procedure applies only where the state cannot feasibly provide

10

a pre-deprivation hearing. Johnson v. City of Saginaw, 980 F. 3d 497, 508, fn. 4 (citing Silberstein, *supra*, at 315).

Some Sixth Circuit cases formulate the exigency analysis differently, recognizing that in an emergency situation where a valid governmental interest exists, postponement of a hearing until after eviction may be justified. Thomas at 576. Stated otherwise, "[a] prior hearing is not constitutionally required where there is a special need for very prompt action to secure an important public interest and where a governmental official is responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in a particular instance." Id. at 576-577 (citing Flatford v. City of Monroe, 17 F. 3d 162, 167 (6th Cir. 1994), which in turn cites Fuentes v. Shevin, 407 U.S. 67, 91, 32 L. Ed. 2d 556, 92 S. Ct. 1983 (1972)).

Regardless of how it is framed, however, the exigency analysis does not apply in this case. The deprivation of the Plaintiffs' property rights was not unpredictable or random, but instead was planned for weeks or months. And pre-deprivation process was not impracticable or impossible because no emergency or exigency existed. Since two of the three conditions under Copeland are not satisfied, the Court would not be able dismiss the Plaintiffs' procedural due process claim.

Furthermore, since no emergency or exigency existed, there was no special need for very prompt action. In addition, the statute in question, M.M.C. §1345.03, does not authorize the closure of a business or the removal of people from their homes, so no action was taken under the standards of a narrowly drawn statute. For those reasons, Thomas does not apply. Therefore, the Plaintiffs were entitled to notice and a pre-deprivation hearing, and the Court need not even reach the question whether there existed adequate post-deprivation remedies.

And even if the Court did reach that question, there was no adequate post-deprivation remedy available here. An adequate remedy at law must be complete. But the statutes under which the Defendants acted do not provide for the award of monetary damages. Thus, no adequate post-

11

deprivation remedy is available. <u>Haddon v. City of Cleveland</u>, 2020 U.S. Dist. Lexis 153935, *27; 2020 WL 5026512 (N.D. Ohio).

To determine whether the Plaintiffs received adequate procedural due process, the Court must weigh three factors: (1) the Plaintiffs' private interest affected by the closure, (2) the risk of an erroneous deprivation of the Plaintiffs' interest through the procedure used, and the probable value, if any, of additional substitute procedural safeguards, and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the substitute procedural requirement would involve. <u>Matthews v. Eldridge</u>, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976); <u>United Pet Supply</u>, *supra*, at 485.

As to the first factor, there is no question that the Plaintiffs were deprived of a private interest, namely, their property interest in their home and business. The Supreme Court has recognized that the "right to maintain control over [one's] home, and to be free from governmental interference, is a private interest of historic and continuing importance." <u>Good</u>, *supra*, at 44. And the property interest in one's means of livelihood is one of the most significant that a person can possess. <u>Ramsey v. Bd. of Educ. of Whitely Cnty.</u>, 844 F. 2d 1268, 1273 (6th Cir. 1988). Thus, since the privacy interests affected here are of such great magnitude, the first <u>Matthews</u> factor weighs in the Plaintiffs' favor.

As to the second factor, the procedure used entailed a high risk of error by affording little or no protection to the owner of a property that did not actually pose a danger; and the additional procedural safeguards of obtaining the opinion of a professional engineer or a court order could have prevented error and thus could be of high value. On the other hand, however, the Plaintiffs contend that this was not an erroneous deprivation, but a planned and intentional one, made under purported statutory authority. So, the probable value of any additional procedural safeguards may

12

have been *de minimus* because the outcome may have been a *fait accompli*. Nonetheless, the Plaintiffs submit that the second Matthews factor weighs in their favor.

Regarding the third factor, although the government has a strong general interest in abating nuisances, its interest in pre-notice deprivation here is extremely small, if not non-existent, because the property did not pose a danger, and being real property, cannot be absconded. And providing notice and a pre-deprivation hearing and/or additional procedural safeguards like those noted above would be no more administratively burdensome, expensive, and time consuming than providing a post-deprivation hearing, or least not significantly so, especially considering the private interests at stake. Therefore, the third Matthews factor weighs in favor of the Plaintiffs.

Since all three Matthews factors weigh in their favor, the Court must conclude that the Plaintiffs did not receive adequate due process, or in the alternative, that there is a strong likelihood of their making that showing. And as is demonstrated below, the Plaintiffs already have, and are extremely likely to continue, to incur a great deal of irreparable harm if a TRO and preliminary injunction are not issued. Accordingly, they need not show a high likelihood of success of this claim, although they submit they have made that showing.

No Defendant has absolute immunity. And qualified immunity will not be available to any individual Defendant because as of October 20, 2020, the right of the Plaintiffs not to have their business closed and to be removed from their home without prior notice and a hearing was clearly established. Good, *supra*, Soldal v. Cook County, Illinois, 506 U.S. 56, 121 L. Ed. 2d 450, 113 S. Ct. 538 (1992), Thomas, *supra*, Phillips, *supra*, Powell v. Morales, 2006 U.S. Dist. Lexis 11024, *23; 2006 WL 721354 (N.D. Ohio 2006)]*supra*, and Johnson v. City of Saginaw, 980 F. 3d 497; 2020 U.S. App. Lexis 35683; 2020 Fed. App. 0358P; 2020 WL 66886124, Fitzpatrick v. City of Dearborn Heights, 1999 U.S. App. Lexis 10909, and Haddon v. City of Cleveland, 2020 U.S. Dist. Lexis 153935; 2020 WL 5026512 (N.D. Ohio), mandate that conclusion.

13

For the above reasons, the Plaintiffs submit that they would likely succeed on their claim that the Defendants, acting under color of state law, deprived them of their rights under the Fifth and Fourteenth Amendments.

### *Fourth Amendment Illegal-Seizure Claim*

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures." U.S. Const., amend. IV. The Fourth Amendment thus protects two kinds of expectations, one involving searches, and the other seizures. Powell, *supra*, (citing United States v. Jacobsen, 466 U.S. 109, 113, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984).) The right applies with equal force in both criminal and civil contexts. Thomas, *supra*, at 569. A seizure of property occurs where "there is some meaningful interference with an individual's possessory interest in that property." Powell, *supra*, at *23. A seizure threatens a person's distinct interest in retaining possession of his or her property. Thomas, *supra*, at 570. In order to be actionable, a seizure must be objectively unreasonable. Id. at 574 (citing Soldal, *supra*, at 71). To assess the reasonableness of a seizure, Courts "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interest alleged to justify the intrusion." Phillips, supra, at *59-*60 (citing Autoworld Specialty Cars, Inc. v. United States, 815 F. 2d 385, 389 (6th Cir. 1987)(quoting Jacobsen, *supra*, at 125.)

In Thomas, *supra*, the government evicted the tenants of a women's shelter without statutory authority or a court order, and no emergency justified their doing so. For those reasons, the government was found to have violated the tenants' rights against unreasonable seizure. That is exactly what happened to the Plaintiffs, except they were the property owners, not tenants. A seizure occurred because the government removed the Plaintiffs from their home, thereby depriving them of their possessory interest in it, without statutory authority and without a court order, and no

14

emergency justified its doing so. Thus, the seizure was objectively unreasonable because it is unsupported by objectively reasonable grounds.

The Defendants knew the Plaintiffs owned the Budget Inn, operated their business from there, and lived there. Nonetheless, the Defendants closed the building and removed the Plaintiffs under M.M.C. §1345.03, entitled, "Summary Abatement." But nothing in that statute authorizes the removal of persons from their homes. Moreover, there was no emergency or exigency that justified the Defendants' actions. Finally, no court order authorized the Defendants' actions. While the government has a general interest in the abatement of nuisances, the condition of the Plaintiffs' motel did not pose an imminent threat to public safety. Therefore, the Plaintiffs' Fourth Amendment possessory interest in their home outweighed any purported government interest.

For the above reasons, the Plaintiffs are likely to succeed in showing that the Defendants, acting under of state law, deprived them of their Fourth and Fourteenth Amendment rights. And again, under Malam, *supra*, the likelihood of success that must be shown need not be high where the chances of irreparable harm are high.

No Defendant has absolute immunity. And qualified immunity will not be available to any individual Defendant because based on the foregoing authorities, as of October 20, 2020, the right of the Plaintiffs not to have their home seized in an objectively unreasonable manner was clearly established.

### Substantive Due Process Claim

The Due Process Clause of the Fifth Amendment to the United States Constitution prohibits the government from depriving a person of life, liberty or property. U.S. Const., amend. V. That protection applies to citizens and non-citizens. Malam, *supra*, at 880.

Under substantive due process, government deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures used. Phillips, *supra*, at *70. One

15

aspect of substantive due process is the right to be free from "arbitrary and capricious" government action. Id. To prove a substantive due process violation, a plaintiff must show either: (1) the denial of a right, privilege or immunity granted by the Constitution or federal statute, or (2) an official act that shocks the conscience of the court. Id.

In the case, the Plaintiffs have alleged both items a (1) and (2) from the preceding paragraph: the unauthorized seizure of, and removal from, their home, and the closure of their business, which they submit violates their Fourth, Fifth, and Fourteenth Amendment rights, and is an official act that should shock the Court's conscience.

The Plaintiffs submit to the Court that they have shown a substantial likelihood of success on the merits. Again, under Malam, supra, the likelihood of success that must be shown need not be high where the chances of irreparable harm are high.

No Defendant has absolute immunity. And qualified immunity will not be available to any individual Defendant because based on the authorities cited above, as of October 20, 2020, the rights of the Plaintiffs against the unauthorized seizure of, and removal from, their home, and closure of their business, were clearly established.

**(2) The Plaintiffs will suffer irreparable injury without the injunction.**

Without a TRO and/or preliminary injunction, the Plaintiffs will most assuredly suffer irreparable injury. They already have and will continue to do so. And "[w]hen constitutional rights are threatened or impaired, irreparable injury is presumed." Malam, supra, at 875 (quoting Obama for Am. v. Husted, 697 F.3d 423, 436 (6th Cir. 2012). In the preceding section, the Plaintiffs have shown they are likely to succeed on the claims for violation of their rights to procedural due process, against unreasonable seizure, and to substantive due process. Therefore, under Malam, supra, the Court may presume that the Plaintiffs have suffered irreparable injury. The finding that a constitutional violation is likely is sufficient for a court to find irreparable harm. Id. at 880 (citing the

16

preceding quote from Obama, *supra*, and Overstreet v. Lexington-Fayette Urban Cty. Gov., 305 F.3d 566, 578 (6th Cir. 2002).

In addition, however, since the Budget Inn has been closed since October 20, 2020, and because the Defendants posted signs on the doors declaring the building unsafe for human occupancy, the Plaintiffs stand to incur a permanent loss of customers, income, and business goodwill. The loss or potential loss of customers qualifies as irreparable injury for purposes of injunctive relief. See e.g., Phillip Morris, Inc. v. Pittsburgh Penguins, Inc., 589 F. Supp. 912, 919 (W.D. Pa. 1983); R. J. Reynolds Tobacco Co. v. Phillip Morris, Inc., 60 F. Supp. 2d 502, 511 (M.D.N.C. 1999) ("loss of existing potential customers" has "been held to satisfy the irreparable injury requirement"). So too does the loss of customer goodwill "because the damages flowing from such losses are difficult to calculate." Basicomputer Corp. v. Scott, 973 F.2d 507, 512 (6th Cir. 1992). An injury is irreparable when there is no plain, adequate and complete remedy at law for its occurrence and when any attempt at monetary restitution would be "impossible, difficult or incomplete." Overstreet, *supra*, at 578-579 (6th Cir. 2002).

For the above reasons, the Plaintiffs urge the Court to presume irreparable injury to them, or to find that they have demonstrated they will suffer same.

**(3) Injunctive relief will not cause substantial harm to others, and the public interest would be served by granting the injunction.**

When the government opposes the issuance of a temporary restraining order, the final two factors--the balance of equities and the public interest--merge, because the government's interest is the public interest. Malam, *supra*, at 888 (citing Pursuing America's Greatness v. Fed. Election Comm'n., 831 F. 3d 500, 512, 425 U.S. App. D.C. 31 (D.C. Cir. 2016), which in turn cites Nken v. Holder, 556 U.S. 418, 435, 129 S. Ct. 1749, 173 L. Ed. 2d 550 (2009). The public has an interest in preserving the peoples' constitutional rights. Id. (citing G & V Lounge Inc. v. Mich. Liquor Control

17

Comm., 23 F.3d 1071, 1079 (6th Cir. 1994). And the Plaintiffs submit that an injunction will not cause substantial harm to either the Defendants or anyone else.

Because all factors weigh in favor of granting injunctive relief, the Plaintiffs move the Court to issue a TRO and/or preliminary injunction.

### III. CONCLUSION

Based upon the foregoing facts and authorities, it should be eminently clear to the Court that the Plaintiffs are entitled to a preliminary injunction, as they have demonstrated that: (1) they have a strong likelihood of success on the merits of their claims that the Defendants have violated their rights to procedural due process, against unreasonable seizure, and to substantive due process; (2) without an injunction, they will suffer irreparable injury in the way of being deprived of their home, livelihood, lost income, and the goodwill of their business; and (3) no substantial harm to others would stem from the issuance of an injunction, and that the public interest would be served by protecting persons from the flagrant violation of their fundamental constitutional rights.

WHEREFORE, based upon the foregoing reasons, the Plaintiffs move the Court to issue a TRO and/or preliminary injunction commanding the Defendants to immediately: (1) remove all tape and signs declaring the motel to be unsafe for human occupancy; (2) reopen the Budget Inn motel for business; (3) allow the Plaintiffs Dinesh Patel and Minaxi Patel to move back into and reside at their apartment inside the motel; and (4) any other relief it deems just and equitable. A proposed order granting a preliminary injunction is attached as Exhibit A.

Respectfully submitted,

/s/Bertrand R. Puligandla
Bertrand R. Puligandla (OH61140)
1700 Canton, Ste. 1-A
Toledo, Ohio 43604
Telephone: (419) 283-0698
Facsimile: (419) 321-1991
Email: brpesq@hotmail.com
Counsel for the Plaintiffs

18